IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **DOLORES ZOLOTOR**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MWI VETERINARY SUPPLY, INC. and AMERISOURCEBERGEN DRUG CORPORATION**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 2:23-cv-2483** |

**COMPLAINT**

Plaintiff, Dolores Zolotor, hereby alleges claims under the Title VII and the Americans with Disabilities Act (ADA) against MWI Veterinary Supply, Inc. ("MWI") and AMERISOURCE BERGEN DRUG CORPORATION ("AMERISOURCE") as follows:

**JURISDICTION AND VENUE**

1. Plaintiff is a resident of Kansas.

2. Defendant MWI is an Idaho Corporation with its principal place of business in Boise, Idaho.

3. Defendant Amerisource is a Delaware Corporation with its principal place of business in Pennsylvania.

4. This Court has personal jurisdiction over MWI because Defendant can be found in, resides in, and/or transacts business in this judicial district.

5. This Court has personal jurisdiction over Amerisource because Defendant can be found in, resides in, and/or transacts business in this judicial district.

6. MWI, on information and belief is owned and directed by Amerisource.

**FACTUAL STATEMENT**

7. Plaintiff Dolores Zolotor was an employee of MWI and/or its predecessor in interest from approximately March 24, 2009 until January 7, 2022, as a Staff Pharmacist.

8. On or about August 24, 2021, MWI issued a mandate, as directed by Amerisource, requiring its employees to receive a vaccine against COVID-19 in order to continue her employment with MWI.

9. Zolotor is a practicing Catholic.

10. Due to Zolotor's religious beliefs about the three available COVID-19 vaccines, including their development in connection with aborted fetal cell lines, she was morally opposed to receiving the vaccines against COVID-19.

11. During Zolotor's employment, MWI engaged in activities that singled out and marginalized Plaintiff based on her religious beliefs.

12. MWI falsely claimed that mRNA vaccines had not been tested or developed using aborted fetal cell lines thus attempting to make Zolotor's beliefs against receiving a Covid-19 vaccine seem, for lack of a better term, crazy.

13. Zolotor worked in a warehouse distribution center for MWI.

14. Under the applicable vaccination policy, most of the individuals who worked in the warehouse distribution center for MWI were exempt from the vaccinate mandate policy, but because Zolotor was a Pharmacist, she was not able to be exempt like the warehouse workers.

15. That is, Zolotor was still required to be vaccinated even though other individuals who worked in close proximity with Zolotor and through whose workspace Zolotor had to traverse in order to get to and from her work area were allowed to remain unvaccinated.

16. On September 10, 2021, Zolotor submitted a request for a religious accommodation to maintain her employment without receiving the vaccine.

17. Defendant did not dispute the sincerity of Zolotor's religious beliefs underlying the religious accommodation request.

18. After determining that Zolotor's request was sincere, she was asked to fill out additional paperwork regarding her requires by September 16, 2021.

19. Further bolstering those who had moral objections to the COVID-19 was the information available comparing the mRNA vaccines in particular to a software upgrade.

20. A TEDx Beacon Street talk by Tal Zaks, a then-chief medical officer for Moderna, Inc. stated "we've been living this phenomenal digital scientific revolution, and I'm here today to tell you, that we are actually hacking the software of life" and then explained that Moderna thinks of mRNA like an "operating system."

21. The title of Tal Zaks's speech was "Rewriting the Genetic Code: A Cancer Cure in the Making."

22. During Zaks's speech about mRNA technology (a speech given before the COVID-19 pandemic) stated, "In every cell there's this thing called messenger RNA or mRNA for short, that transmits the critical information from the DNA in our genes to the protein, which is really the stuff we're all made out of. This is the critical information that determines what the cell will do. So we think about it as an operating system…. So if you could actually change that… if you could introduce a new line of code, or change a line of code, it turns out that has profound implications for everything, from the flu to cancer."

23. The mRNA vaccines were not approved by the FDA at the time of the mandate, rather they were being provided under the Emergency Use Authorization while final formal approval was pending.

24. The above information led many Americans to conclude the COVID-19 vaccines

presented an immoral medical procedure and that to receive such a vaccine would violate the religious moral conscious in some way.

25. The COVID-19 vaccine was developed and promulgated during the Trump administration, and former president Trump endorsed the vaccine and indeed himself received the COVID-19 vaccine.

26. The COVID-19 vaccine mandate implemented by MWI was the result of requirements of the Biden administration.

27. Despite the fact that the vaccine was developed under the leadership of a Republican president, that taking the vaccine was supported by a Republican president, and the vaccine mandate was implemented under a Democratic president, those like Plaintiff who expressed religious objections, were treated by MWI and minimized as individuals whose objections were based on politics and not religion.

28. MWI, for its part, actively pressured its employees to receive the vaccination, creating an environment of hostility against those, like Zolotor, who did not want to receive the vaccine for religious reasons.

29. Before MWI's August 2021 vaccine mandate rollout and decision-making about how to apply employee religious accommodation requests, the waning effectiveness of the vaccine was well established.

30. By July 2021, an Israeli study showed that out of 7,700 new COVID-19 cases, 40% involved vaccinated people whereas only 1% involved patients previously infected with COVID-19.

31. In fact, the declining effectiveness of COVID-19 vaccines worldwide was well-known by July 2021. https://www.cnbc.com/2021/07/23/delta-variant-pfizer-covid-vaccine-

39percent-effective-in-israel-prevents-severe-illness.html.

32. In August 2021, Anthony Fauci appeared on CBS's *Face the Nation* and reported finding that "the level of virus in the nasopharynx of people who are vaccinated who get breakthrough infections, it's really quite high and equivalent to the level of virus in the nasopharynx of unvaccinated people who get infected."

33. In the same interview, Fauci acknowledged, "[s]o we know now that vaccinated people who get breakthrough infections can spread the virus to other people."

34. During this time, the ineffectiveness of the mRNA vaccine was further fleshed out, including in leading medical journals.

35. In October 2021, an article in *The Lancet* similarly stated that:

> fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in household settings, including to fully vaccinated contacts.

36. In October 2021, researchers published an article on preprint server medRxiv entitled, "No Significant Difference in Viral Load Between Vaccinated and Unvaccinated, Asymptomatic and Symptomatic Groups When Infected with SARS-CoV-2 Delta Variant."

37. MWI created a daily culture of pressure and intimidation as it related to individuals who had an objection against receiving the vaccine by the constant implication of job loss, and therefore instilling fear in its religiously objecting employees that they would not have a way to provide income for their family and face homelessness or worse, unless they violated their conscious and received the vaccine.

38. The MWI's actions created a hostile environment.

**Additional Facts About COVID-19 Vaccine and Religious Objections**

39. Presently, all COVID-19 vaccines used either in production or testing of fetal cell lines developed from tissues derived from aborted fetuses (see excerpt below).[1]

> Los Angeles County
> **COVID-19 VACCINE AND FETAL CELL LINES**
>
> In various stages of vaccine development and manufacturing, some of the COVID-19 vaccines used cells originally isolated from fetal tissue (often referred to as fetal cells), some of which were originally derived from an aborted fetus. The use of fetal cell lines is a very sensitive and important topic within some faith communities and among individuals with concerns about the ethics of using materials derived in this way.

40. For example, the Johnson & Johnson vaccines used fetal cell cultures, specifically PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.[2]

41. In an interview with WREG, Dr. Steve Threlkeld, president of the medical staff at Baptist Hospital in Memphis, Tennessee, acknowledged fetal cell lines used to produce or test the Johnson & Johnson COVID-19 vaccines "were actually recovered from an aborted fetus in the 70s or 80s and there are several of these cell lines."[3]

---

[1] *See,* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf (last accessed August 26, 2021)

[2] Are the vaccines made with fetal cells, Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-faq/are-the-mrna-vaccines-made-with-fetal-cells/ (last accessed August 26, 2021), see also, Tennessee Department of Health, Fact v. Fiction: Johnson & Johnson Vaccine(2021) available at https://covid19.tn.gov/stay-informed/blogs/fact-v-fiction-johnson-johnson-vaccine/ (last visited Sept. 27, 2021) (acknowledging the Johnson & Johnson vaccine was developed from a fetal cell line).

[3] WREG, *State: Fetal cell lines, not fetal tissue, were used to make Johnson & Johnson vaccine* (March 5, 2021) available at https://www.wreg.com/news/state-fetal-cell-lines-not-fetal-tissue-was-used-to-make-johnson-johnson-vaccine/ (last visited Sept. 27, 2021).

42. As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293 was used during the research and development phase.[4] All HEK 293 cells are descended from tissue taken in 1973 from either an abortion or miscarriage[5] that took place in the Netherlands.[6]

43. While the production of the vaccines did not reportedly require any new abortions, Zolotor objected to receiving the COVID-19 vaccines on the basis that, even assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-gotten gains.

44. Zolotor believes any benefit the COVID-19 vaccines may confer flows from the unjust exploitation of unborn human life. On this basis alone could Zolotor refuse on religious grounds to accept the COVID-19 vaccines.

**Additional Facts Reflecting The COVID-19 Vaccine Did Not Prevent Infection or Transmission**

45. The COVID-19 vaccine has been ineffective at preventing the transmission and infection of SARS-CoV-2.

46. Indeed, the vaccine has demonstrated *negative effectiveness* and could even increase the risk of infection.[7]

---

[4] *See*, Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells?*, https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells, (last visited on Aug. 26, 2021).

[5] *COVID-19 Vaccine and Fetal Cell Lines.*

[6] *Ibid*.

[7] Altarawneh, H., Chemaitelli, H., et al. *Effects of Previous Infection and Vaccination on Symptomatic Omicron Infections,* N. Engl. J. Med. 2022; July 7, 2022, DOI: 10.1056/NEJMoa2203965; Florentino, P., Millington, T., *Vaccine effectiveness of two-dose BNT162b2 against symptomatic and severe COVID-19 among adolescents in Brazil and Scotland over time: a test-negative case-control study,* The Lancet, August 8, 2022, DOI: https://doi.org/10.1016/S1473-3099(22)00451-0; *see* Nass, Meryl, COVID-19 Vaccines Don't Prevent Transmission, Severe Illness or Deaths, Data Show, *The Defender,* April 4, 2022, available at https://childrenshealthdefense.org/defender/covid-vaccines-dont-prevent-transmission-severe-illness-deaths-data/.

47. Israeli data found that those who had received the BioNTech vaccine were 6.72 times more likely to suffer a subsequent infection than those with natural immunity.[8] Israeli data also indicates the protection BioNTech grants against infection is short-lived compared to natural immunity and degrades significantly faster.

48. A paper published in *Eurosurveillance*, a journal published by the European Centers for Disease Control, documents a significant outbreak of COVID-19 among fully vaccinated patients and staff at a hospital in Tel Aviv.[9] At the time of the outbreak, investigators determined 238 out of 248 of exposed patients and staff had been fully vaccinated with Pfizer's mRNA vaccine. Ultimately, 39 out of the 238 exposed vaccinated people (16 percent) were infected, along with 3 out of 10 unvaccinated people - a difference that does not reach statistical significance because the unvaccinated group is too small. Of the infected, 23 were patients and 19 staff.[10] The staff all recovered quickly, but five patients died and another nine had severe or critical cases. ***All were vaccinated***. On the other hand, the three unvaccinated infected patients both had only ***mild*** cases of COVID-19.

49. A senior Pfizer executive recently admitted that Pfizer did not even know whether its mRNA COVID-19 shot stopped transmission before Pfizer began administering it to the public.[11]

---

[8] David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection?* Israel National News, (Jul. 13, 2021), available at https://www.israelnationalnews.com/News/News.aspx/309762 (last visited Aug. 26, 2021).

[9] Pinina Shitrit, et. al., *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021*, (July 2021) available at https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2021.26.39.2100822#html_fulltext (last visited on Oct. 3, 2021).

[10] *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021*.

[11] Pfizer did not know whether Covid vaccine stopped transmission before rollout, executive admits, October 13, 2022, *news.com.au*, available at

50. It should, therefore, come as no surprise that in their real-world application the vaccines have not shown that they are effective at stopping infection or preventing vaccinated persons from spreading the virus.

**Employers Failing to Grant Reasonable Accommodations in the Face of Vaccine Mandates Have Been Held Liable.**

51. The discouragement or denial of religious accommodations from employers' mandatory vaccine policies has been found unlawful, even when those mandates were proscribed by hospitals. Indeed, numerous employers have been sued and lost over forced vaccines. *See, e.g. EEOC v. Mission Hosp. Inc.*, No. 1:16-cv-118-MOC-DL, 2017 WL 3392783 (W.D.N.C. Aug. 2017) [resulting in permanent injunction against the employer from improperly denying religious exemptions from mandated vaccines and requiring employer to pay $89,000 in damages]; *United States v. Ozaukee County*, No 18-cv-343-pp (E.D. Wis. 2018) [resulting in a permanent injunction against the employer for failure to grant religious exemptions from compulsory vaccines and order payment of damages to employee].

52. Likewise, in *EEOC v. Saint Vincent Health Center*, Civil Action No. 1:16-cv-234 (2016), the employer agreed to pay $300,000 to a class of six aggrieved former employees and provided substantial injunctive relief to settle a religious discrimination lawsuit based upon a failure to grant a religious exemption as part of a mandatory seasonal flu vaccination requirement for its employees.

53. Moreover, in *EEOC v. Memorial Healthcare*, Civil Action No. 2:18-cv-10523 (2018), the defendant employer paid $74,418 ($34,418 in back pay, $20,000 in compensatory

---

https://www.news.com.au/technology/science/human-body/pfizer-did-not-know-whether-covid-vaccine-stopped-transmission-before-rollout-executive-admits/news-story/f307f28f794e173ac017a62784fec414

damages and $20,000 in punitive damages) for refusing to hire a medical transcriptionist because of her religious beliefs against receiving flu shots and refusing to accommodate those beliefs.

54. In fact, as recently as 2018, the U.S. Equal Employment Opportunity Commission sued Nashville-based Saint Thomas Health, after the employer failed to make a reasonable religious accommodation for the flu vaccine. *EEOC v. Saint Thomas Health*, Civil Action No. 3:18-cv-00978 (M.D. Tenn. 2018).

55. The *Saint Thomas Health* case resulted in a consent decree enjoining the employer from failing to provide religious accommodations to an employee's sincerely held religious beliefs unless such requests created an undue hardship. The decree also awarded the injured employee $75,000 in damages and directed the employer to issue the employee an apology letter.

56. Indeed, on November 12, 2021, the U.S. Court of Appeals for the Fifth Circuit granted a stay of the Occupational Safety and Health Administration's nationwide vaccine mandate, stating that the mandate "raises serious constitutional concerns" and that "a denial of the petitioners' proposed stay would do them irreparable harm," as the Mandate threatens to substantially burden the liberty interest of reluctant individual recipients put to a choice between their job(s) and their jab(s)." BST Holdings v. OSHA, Order Granting Stay (U.S. Ct. App. 5th Cir.) (November 12, 2021). In implementing the mandate, the 5th Circuit concluded that OSHA likely "violates the constitutional structure that safeguards our collective liberty." *Ibid.*

57. What is more, on November 21, 2021, the Honorable District Judge William LaFortune of the Tulsa County District Court granted the State of Oklahoma's application for a temporary restraining order against Ascension Healthcare, after the hospital rode roughshod over the religious rights of its employees by imposing a draconian vaccine mandate similar to CHC's.

*O'Connor v. Ascension Healthcare*, Case. No. CJ-2021-3251 (Tulsa Cnty. Dist. Ct. 2021) (docket publicly accessible on OSCN.net); *See also O'Connor v. Ascension Healthcare*, Case No. 21-CV-488-TCK-SH (N.D. Okla. 2021) (the Honorable Judge Kern remanding the case to Tulsa County District Court for further proceedings).

**Zolotor was illegally terminated by MWI when it rejected her religious accommodation requests against received a corporately mandated COVID-19 vaccine.**

58. Zolotor's request for religious accommodation to be exempt from the vaccine mandate, submitted on September 9, 2021, was denied on December 1, 2021.

59. On or about December 1, 2021, Zolotor was informed that her termination will be effective on January 7, 2022.

60. On or about January 7, 2022, Zolotor's employment with MWI was terminated because she did not receive the vaccinations mandated by MWI.

61. It is well-established that the legitimacy of a religious belief or practice need not be acceptable, logical consistent, or comprehensible to be protected religious beliefs.[12]

62. It is also well-established that when a person articulates religious beliefs, their beliefs are not rendered illegitimate merely because he or she cannot articulate them with the clarity or precision that a more sophisticated person might.[13]

**<u>COUNT I– VIOLATION OF THE KANSAS ACTS AGAINST DISCRIMINATION RELIGIOUS DISCRIMINATION</u>**

63. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

---

[12] *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ("[W]hat is a 'religious' belief or practice ... is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection*.").*

[13] *Id.* At 715.

64. Kansas H.B. 2001 makes it illegal for an employer to inquire into the sincerity of an employee's religious exemption request and or to otherwise deny an employee's religious exemption request.

65. Under the Kansas Civil Rights Act,"[i]t shall be an unlawful employment practice for an employer, because of race religion, color, sex, disability, national origin or ancestry of any person to refuse to hire or employ such person; to bar or discharge such person from employment or to otherwise discriminate against such person in compensation or in terms, conditions or privileges of employment; to limit, segregate, separate, classify or make any distinction in regards to employees; or to follow any employment procedure or practice which, in fact, results in discrimination, segregation or separation without a valid business necessity." K.S.A. 44-1009.

66. Plaintiff holds sincere religious beliefs that preclude her from receiving a COVID-19 vaccine. While there may be some who consider COVID-19 vaccines to be acceptable, no employer in Kansas, public or private, is permitted to decide for itself whose religious beliefs are valid, and whose are not.

67. Once an employee has articulated her sincerely held religious objections to acceptance or receipt of the currently available COVID-19 vaccines, the proper inquiry is thus at its end as to that element.

68. Defendant's COVID-19 vaccine mandate, which threatened forced resignation for non-compliant employees, discriminates against employees who do not wish to receive the vaccine on religious grounds.

69. Plaintiff sought an exemption from Defendant's COVID-19 vaccine mandate based on her sincere religious beliefs.

70. Defendant denied Plaintiff's exemption request and ended her employment.

71. As such, Defendant has failed to provide *any* reasonable accommodation, but has rather implemented a punitive measure against employees who choose to exercise their religious rights.

72. Defendant was made fully aware of the conflict between its COVID-19 vaccine mandate and Plaintiff's religious beliefs. Defendant responded with terminating Plaintiff's employment by calling it a "resignation".

73. Defendant's failure to provide reasonable accommodations to Plaintiff's sincere religious beliefs has injured and will continue to injure Plaintiff by discriminatorily denying her income and by terminating her livelihood.

74. Because Plaintiff has established a *prima facie* showing of religious discrimination, the burden would then shift to Defendant to demonstrate that it could not accommodate the Plaintiff's religious needs without undue hardship, which it cannot do here.

75. Defendant cannot show that affording Plaintiff other accommodations it provided to individuals with serious health conditions, many of which Defendant, has been implementing since March 2020, would impose an undue hardship in the context of employer vaccination policies.

76. As such, Defendant discriminated against Plaintiff based on her sincerely held religious beliefs, failed to provide a reasonable accommodation to Plaintiff's religious exemption request, and therefore, violated the K.A.A.D.

## COUNT II - RELIGIOUS DISCRIMINATION, HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

77. Plaintiff hereby incorporates the foregoing paragraphs by reference.

78. Plaintiff was subject to harassment, discrimination, and disciplinary action in the form of termination, based on her religion.

79. Defendant's conduct created a hostile work environment based on religion.

80. Plaintiff was denied a reasonable accommodation for her religion.

81. The accommodation Plaintiff sought did not impose a substantial burden on Defendant as other individuals at her worksite were exempt from the vaccine mandate.

82. Plaintiff was entitled to an accommodation in the form of being treated the same as vaccinated employees because there was no hardship on Defendant because those who accepted the forced vaccination requirements by Defendant could become sick from and transmit COVID-19.

83. Defendant treated Plaintiff more harshly than non-vaccinated employees on account of her religion and her asserted religious beliefs when there was no legitimate reason to treat her in such a way.

84. Plaintiff caused a charge of discrimination to be filed with state and federal agencies within the appropriate time period, and Plaintiff filed this petition within ninety days after the date of her receipt of a right to sue letter.

85. As such, this action is timely, and Plaintiff has exhausted all administrative prerequisites to filing this action.

86. As a direct result of the unlawful conduct of Defendant as set forth herein, Plaintiff has suffered damages which include lost wages, lost reputation, mental anguish, emotional distress, pain and suffering, a detrimental job record, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses, all of a continuing nature.

87. Defendant's discrimination was intentional and in reckless disregard of Plaintiff's rights to be free of discrimination on account of her religion, thereby entitling her to punitive damages.

## COUNT III - RETALIATION IN VIOLATION OF TITLE VII

88. Plaintiff hereby incorporates the foregoing paragraphs by reference.

89. Plaintiff engaged in protected activity by seeking a religious accommodation.

90. Plaintiff was subject to retaliation as a result of asking for a religious accommodation.

91. Defendant displayed a retaliatory animus against Plaintiff as a result of her asking for a religious accommodation by putting her religious beliefs under close scrutiny as if Defendant was the arbiter of reasonable religious beliefs, and then rejected their legitimacy.

92. Defendant terminated Plaintiff on account of her request for reasonable accommodation, as it was against Kansas Law to deny religious accommodation request.

93. Defendant granted accommodations to other individuals to exempt them from the vaccine requirement but did not do so for Plaintiff.

94. Defendant professed not to accept religious accommodations and was aggravated Plaintiff attempted to obtain one.

95. Plaintiff caused a charge of discrimination to be filed with state and federal agencies within the appropriate time period, and Plaintiff filed this petition within ninety days after the date of her receipt of a right to sue letter.

96. As such, this action is timely, and Plaintiff has exhausted all administrative prerequisites to filing this action.

97. As a direct result of the unlawful conduct of Defendant as set forth herein, Plaintiff has suffered damages which include lost wages, lost reputation, mental anguish, emotional distress, pain and suffering, a detrimental job record, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses, all of a continuing nature.

98. Defendant's discrimination was intentional and in reckless disregard of Plaintiff's rights to be free of discrimination on account of her religion, thereby entitling her to punitive damages.

WHEREFORE Plaintiff prays for judgment against Defendant and an award for her economic damages, compensatory damages, emotional distress, pre- and post-judgment interest, attorneys' fees, punitive damages, and any other relief the Court deems just and equitable.

## COUNT IV – DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

99. Plaintiff hereby incorporates the foregoing paragraphs by reference.

100. As of at least August 2021, MWI knew or should have known that due to the waning effectiveness of the mRNA vaccine against COVID-19, unvaccinated individuals should not have been treated differently with regard to masking or vaccination than those who did receive the mRNA vaccine against COVID-19.

101. As of at least August 2021, Defendant MWI, in light of the available evidence regarding the spread of the COVID-19 – including reports in its workplace that mRNA vaccinated individuals were still becoming ill from COVID-19 – knew or should have known that to protect the workplace against COVID-19, that all employees should have been subject to the same masking policies, not just Plaintiff.

102. Despite Defendant's knowledge *supra*, Plaintiff was subject to discrimination and disciplinary action based on a perceived disability because she did not have certain antibodies as part of her bodily function when compared to vaccinated individuals who were perceived – wrongly – to have the desired antibodies, and therefore a more desirable immune system.

103. Defendant did not follow its ordinary policies and procedures with regard to Plaintiff as compared to vaccinated individuals when it proceeded to terminate Plaintiff because of her unwillingness to receive the COVID-19 vaccine (i.e. that Plaintiff was regarded as unable to perform essential functions of her job without the presence of the vaccine induced spike protein in her body).

104. Defendant terminated Plaintiff's employment based on the perception she was disabled as a result of not having received the COVID-19 vaccine.

105. Defendant terminated Plaintiff based on a perception her natural immunity was insufficient to protect against catching or transmitting COVID-19, however the information available to MWI established that even those who received COVID-19 vaccines were still catching and capable of transmitting COVID-19.

106. Defendant incorrectly and discriminatorily viewed Plaintiff as immunocompromised as a result of not receiving the mRNA vaccine when in fact she was not objectively so immunocompromised.

107. Plaintiff was subject to higher scrutiny than similarly situated coworkers on account of Defendant perceiving her as disabled for not having received the COVID-19 vaccine when compared to employees who did.

108. Employees who did receive the COVID-19 vaccine were able to work under relaxed work expectation as compared to Plaintiff.

109. In fact, however, there was no measurable basis on which to determine that individuals who had the vaccine-induced spike protein, as compared to those who did not.

110. The terms and conditions of Plaintiff's employment were adversely affected because of this perceived disability.

111. Plaintiff filed a charge of discrimination with the Kansas Human Rights Commission and EEOC within the appropriate time period, and Plaintiff filed this Complaint within ninety days after the date of her receipt of her right to sue letter(s).

112. As such, this action is timely, and Plaintiff has exhausted all administrative prerequisites to filing this action.

113. As a direct result of the unlawful conduct of Defendant, as set forth herein, Plaintiff has suffered damages which include lost wages, lost reputation, mental anguish, emotional distress, pain and suffering, a detrimental job record, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses, all of a continuing nature.

114. Defendant's acts were willful and taken in reckless disregard for Plaintiff's rights to be free of discrimination and retaliation such that Plaintiff is entitled to punitive damages.

WHEREFORE Plaintiff prays for judgment against Defendant and an award for her economic damages, compensatory damages, emotional distress, pre- and post-judgment interest, attorneys' fees, punitive damages, and any other relief the Court deems just and equitable.

**DEMAND FOR JURY AND PLACE OF TRIAL**

Dolores Zolotor hereby demands a jury trial to be held in Kansas City, Kansas.

Respectfully Submitted,

**THE MEYERS LAW FIRM LC**

By: /s/ Kevin C. Koc .

Kevin C. Koc, KS #24953
4435 Main Street Ste 503
Kansas City, Missouri 64111
(816) 444-8500 Telephone
(816) 444-8508 Facsimile
kkoc@meyerslaw.com
**ATTORNEY FOR PLAINTIFF**